IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80657-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ZACHARY LOWELL MADDING, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Zachary Madding was convicted of second degree assault in one trial and of forgery and making false statements to a public servant in his second trial. Madding contends retrial is required on the assault conviction due to evidentiary errors. Because he fails to demonstrate prejudice from any alleged error, we affirm his conviction for second degree assault.

Madding argues both convictions from his second trial must be vacated because they were unsupported by the evidence. Because the State demonstrated beyond a reasonable doubt that the arresting officer relied on Madding's falsehood to carry out his official duties, we affirm the conviction for making a false statement to a public servant. But because the State presented only limited, equivocal evidence of Madding's intent to defraud or injure using his fake identification card, the State failed to prove he committed forgery.

Therefore, we affirm in part, reverse in part, and remand to vacate Madding's forgery conviction.

FACTS

Mukilteo police Officer Andrew Jones was on patrol the morning of May 19, 2018, when, at 9:40, a 911 call came from the Staybridge Suites hotel. Officer Jones arrived at the hotel about 45 seconds later. He saw a young woman, Sierra Norbisrath, slumped over on a bench out front and saw two men, Zachary Madding and Kirk Ostermann, grappling on the ground. To secure the scene, Officer Jones immediately handcuffed Madding. Moments later, Officer Vitaliy Shapoval arrived and examined Norbisrath. She was "unresponsive" and "just looked like the life was leaving her."[1] Ostermann told Officer Shapoval that Madding, Norbisrath's ex-boyfriend, had forced her to take Xanax and had sprayed fentanyl up her nose. Officer Steve Fanning had arrived while Officer Shapoval was examining Norbisrath, and he revived her by administering two doses of Narcan.

Officer Jones asked Madding for his name, and Madding gave his brother's name: Joshua Hunter Madding. Officer Jones ran the name through dispatch and concluded it was fake. Officer Jones learned that Madding's real first name was Zachary. Madding then admitted there was a Department of Corrections warrant out for him. After placing him under arrest based on the warrant, Officer Jones searched Madding and found two fake Illinois identification cards with Madding's picture and the name "Nicholas Pavlik." Madding admitted the cards were his and, according to Officer Jones, said he "used them if he needed to, like, stay

---

[1] Report of Proceedings (RP) (Oct. 2, 2019) at 606.

somewhere or book a room at a hotel because of his [Department of Corrections] warrant."[2]

Meanwhile, firefighter and paramedic James Prades transported Norbisrath to the hospital. Norbisrath, who was crying and very emotional, told Prades that Madding had "force-fed her" Xanax and sprayed her 10 to 15 times with fentanyl.[3] Norbisrath also "exclaimed that 'he tried to kill me.'"[4] Norbisrath arrived at the hospital around 10:20 a.m. and was seen by the attending emergency room physician and a forensic nurse examiner. Officer John Ernst interviewed Norbisrath around 11:30 a.m. and then called in the police department's domestic violence coordinator, Danielle Reynolds, to speak with her. Reynolds arrived and interviewed Norbisrath around 1:00 p.m.

The State charged Madding with first degree assault and unlawful imprisonment, both with domestic violence enhancements. He was also charged with forgery and making a false statement to a public servant. The court severed the assault and unlawful imprisonment charges from the forgery and false statement charges.

During the trial on the first degree assault and false imprisonment charges, the court admitted testimony from Norbisrath that Madding assaulted her in January of 2018, a hearsay statement Norbisrath made to Reynolds about being afraid of pressing charges against Madding, and testimony from Officer Jones

---

[2] RP (Nov. 19, 2019) at 264.

[3] RP (Oct. 3, 2019) at 852.

[4] Id. at 853.

about Madding resisting being detained. The jury found Madding not guilty of either charge but convicted him of second degree assault with a domestic violence enhancement. In a separate trial, a jury found Madding guilty of forgery and of making a false statement.

Madding appeals.

ANALYSIS

I. Assault Trial

Madding challenges three of the trial court's evidentiary decisions, arguing they prejudiced him and require retrial. We review a trial court's decision to admit evidence for abuse of discretion.[5] A trial court abuses its discretion when its decision rests on untenable evidentiary grounds or was made for untenable legal reasons.[6]

A. Evidence of Prior Misconduct

Madding contends the court erred when it admitted testimony from Norbisrath under ER 404(b) that he previously assaulted her. The court admitted the testimony because Norbisrath's state of mind was relevant to prove Madding unlawfully imprisoned her through intimidation.[7]

Norbisrath testified that she was afraid of Madding because "he had assaulted me before, in the end of January 2018. He pinned me down on the bed,

---

[5] State v. Gunderson, 181 Wn.2d 916, 922, 337 P.3d 1090 (2014) (citing State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003)).

[6] Id. (citing State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997)).

[7] The court also would have admitted the testimony as proof of motive, but the State chose not to do so.

4

and started hitting me in the face."[8]  When she tried to run away, "he put his hand on the back of my neck, and around my shoulder, and he shoved me really hard, and I slid, like, six feet across the room."[9]

ER 404(b) prohibits the introduction of evidence "to prove the character of a person in order to show action in conformity therewith."  But that same evidence may be admitted "for any other purpose."[10]  Before admitting evidence under ER 404(b), the trial court must

> "(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."[11]

The trial court must provide a limiting instruction if requested by the defendant.[12]

Madding does not argue the court erred by admitting the evidence as proof of unlawful imprisonment.  Instead, he contends the limiting instruction failed to prevent the jury from considering the evidence for the improper purpose of proving Norbisrath's state of mind as it related to the alleged assault.  The court gave the following limiting instruction:

> You may have heard evidence concerning alleged misconduct by the defendant that occurred in January of 2018.  Such evidence may be considered by you only to the extent that you find it relevant

---

[8] RP (Oct. 2, 2019) at 642.

[9] Id.

[10] State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012).

[11] State v. Ashley, 186 Wn.2d 32, 39, 375 P.3d 673 (2016) (quoting ER 404(b)).

[12] State v. Russell, 171 Wn.2d 118, 123, 249 P.3d 604 (2011).

to the issue of Sierra Norbisrath's state of mind on May 19, 2018. It is not to be considered by you for any other purpose.[13]

We presume that the jury follows all instructions as given.[14] Jury instruction 18 stated that a person commits second degree assault "when he or she with intent to inflict bodily harm, administers to or causes to be taken by another poison or any other destructive or noxious substance."[15] Jury instruction 19, the "to convict" instruction for second degree assault, provided Madding was guilty if the jury found (1) that on or about May 19, 2018, Madding "administered to or caused to be taken by Sierra Norbisrath a poison or a destructive or noxious substance; (2) that [Madding] acted with intent to inflict bodily harm;" and (3) the act occurred in Washington.[16] The limiting instruction restricted the jury's ability to consider the prior assault for any reason other than Norbisrath's state of mind on May 19. The jury could consider her state of mind that day for the unlawful imprisonment charge as it related to her intimidation through fear. The specific type of assault contained in instructions,18 and 19 does not allow for consideration of Norbisrath's state of mind when assessing Madding's guilt. And because assessing a witness's credibility is distinct from considering a victim's state of mind,[17] the limiting

---

[13] Clerk's Papers (CP) at 64.

[14] State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001) (citing Degroot v. Berkley Constr., Inc., 83 Wn. App. 125, 131, 920 P.2d 619 (1996)).

[15] CP at 73.

[16] CP at 74.

[17] See Ashley, 186 Wn.2d at 46-47 (distinguishing between admissions of prior misconduct evidence for assessing credibility versus proving a victim's state of mind).

instruction prohibited the jury from using the January 2018 assault to assess Norbisrath's credibility for the assault charge. Because the limiting instruction precluded the jury from considering the January 2018 assault for an improper purpose, Madding fails to show the court abused its discretion.

### B. Hearsay

Madding contends the court erred by admitting hearsay testimony from domestic violence coordinator Reynolds under ER 803(a)(2) as an excited utterance. During their conversation, Norbisrath said she did not want to take legal action against Madding because she feared him. Madding contends the statement was not an excited utterance because the assault occurred hours earlier and Norbisrath had already spoken about it with a paramedic, a physician, a nurse, and a police officer.

A hearsay statement is considered sufficiently reliable to be admitted if it relates to "a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."[18] A hearsay statement can qualify as an excited utterance if three "closely connected" requirements are met: (1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress or excitement caused by the event or condition; and (3) the statement related to the event or condition.[19] "'[T]he startling event or

---

[18] ER 803(a)(2).

[19] State v. Woods, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001) (citing State v. Chapin, 118 Wn.2d 681, 686, 826 P.2d 194 (1992)).

condition need not be the "principal act" underlying the case.'"[20] Because an excited utterance "derives its reliability mainly from the heightened emotional state of the declarant as a result of the startling event, not from the event itself[,] . . . '[f]or purposes of the excited utterance exception, . . . it is the event's effect on the declarant that must be focused upon.'"[21]

Reynolds testified to Norbisrath's statement during direct examination:

[Prosecutor]: And how did [Norbisrath] appear to you?

[Reynolds]: She looked very tired. Her eyes were, you know, only partially open. She had really slurred speech, and her speech was delayed.

[Prosecutor]: Was she able to communicate with you?

[Reynolds]: She was, but the responses I would get, you know, from her were just really delayed, and she was too tired to do a lot of discussion.

[Prosecutor]: Did you question her about the facts of what happened?

[Reynolds]: I did not.

[Prosecutor]: What did you offer her?

[Reynolds]: I had told her that I had made arrangements with [Ostermann] that we would be meeting at the courthouse here Monday morning to start paperwork for protection orders, and I also informed her that we could document any kind of past acts of violence at that time, if she wanted to do so.

[Prosecutor]: What was her reaction when you said that?

[Reynolds]: She had a physical response to that.

---

[20] State v. Young, 160 Wn.2d 799, 810, 161 P.3d 967 (2007) (quoting Chapin, 118 Wn.2d at 686).

[21] Id. at 812-13 (alterations in original) (quoting Chapin, 118 Wn.2d at 687).

[Prosecutor]: Like what?

[Reynolds]: She immediately shrank back in her hospital bed, and she put her hand up in a big stop-sign motion, and her eyes got really big, and she—her speech was very clear, and she had a verbal response, as well.

[Prosecutor]: What did she say?

[Reynolds]: She said, no, she did not want to have—press any more charges against [Madding], she was really scared of him.[22]

Even if Madding is correct about the effects of the assault having worn off, we can affirm the trial court's rulings on any grounds supported by the record,[23] and Madding fails to explain Norbisrath's reaction from the startling event that occurred during her conversation with Reynolds.

Reynolds told Norbisrath they "would be meeting at the courthouse" in several days because she had "made arrangements" for Norbisrath to obtain a domestic violence protection order against Madding based on the current assault and any past assaults.[24] This was news to Norbisrath because Reynolds had made the arrangements only moments before when speaking with Ostermann outside her hospital room. Norbisrath reacted immediately, shrinking back, eyes wide, hand upheld as if saying stop, and actually saying in a clear voice she did not want to take legal action against Madding because she was "really scared of

---

[22] RP (Oct.3, 2019) at 860-61.

[23] State v. Grier, 168 Wn. App. 635, 644, 278 P.3d 225 (2012) (citing State v. Costich, 152 Wn.2d 463, 477, 98 P.3d 795 (2004)).

[24] RP (Oct. 3, 2019) at 861.

him."[25] Because this reaction satisfies the requirements for admitting an excited utterance,[26] Madding fails to show the court abused its discretion.

### C. Resisting

Madding argues the court abused its discretion by admitting Officer Jones's testimony about him resisting when being detained. Officer Jones testified about detaining Madding:

> He was kind of pulling away from me while I was trying to detain him. I had a hold of both of his arms, and, you know, he's pulling me along, as I'm trying to get him detained. And there's nobody else there yet, no other officer besides me, although I knew they were coming, and I could hear they were getting close because I could hear their sirens, but I—as quickly as I would, to make it safe, I detained him. So I was able to get him detained. And I just put him in a kneeling position in front of me, and I stood behind him so that if he were to continue to try and get away from me, it would be harder for him to do that from a kneeling position as opposed to a standing position.[27]

Assuming without deciding that the trial court erred, Madding fails to demonstrate prejudice from the improper testimony.

We review improper admission of evidence using the nonconstitutional harmless error standard.[28] The error was harmless unless "'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'"[29]

---

[25] Id.

[26] Woods, 143 Wn.2d at 597.

[27] RP (Oct. 3, 2019) at 780 (emphasis added).

[28] Gunderson, 181 Wn.2d at 926 (citing Gresham, 173 Wn.2d at 433).

[29] Id. (internal quotation marks omitted) (quoting Gresham, 173 Wn.2d at 433).

Norbisrath testified in detail about Madding crushing up Xanax pills, laying her down on the bed in their hotel room, and pressing his hand to her mouth to make her take them. Norbisrath felt like she had to take them because Madding was "like a crazy person" who "definitely wanted to do [her] harm" and made her feel "really scared."[30] She explained that Madding then took out the bottle of fentanyl spray, put it up her nose, and "kept spraying."[31] Once she could get up, she threw up in the bathroom sink, grabbed a paper bag with a few personal items, and ran into the parking lot. While still outside the hotel, she gave contemporaneous corroborating accounts to Ostermann and Prades, who both testified about those accounts. Emergency room physician Dr. Amy Little also testified that Norbisrath told her about Madding forcing her to take Xanax and fentanyl. Physical evidence from the scene—broken Xanax pills scattered around the hotel bed, a spray bottle with fentanyl on the bed, and vomit in the hotel sink— also corroborated Norbisrath's testimony. On this record, Officer Jones's testimony about Madding's mild resistance to being detained did not impact the outcome of the trial. Madding fails to show prejudicial error.

D. Cumulative Error

Madding argues retrial is required due to cumulative error. The cumulative error doctrine "is limited to instances when there have been several trial errors that standing alone may not be sufficient to justify reversal but when combined may

---

[30] RP at (Oct. 2, 2019) at 673.

[31] Id. at 669.

deny a defendant a fair trial."[32]  Because Madding has demonstrated, at most, a single error, there cannot be cumulative error.

## II. Forgery and False Statements

Madding argues both convictions from his second trial—forgery and making a false statement—should be vacated due to insufficient evidence.

We review the sufficiency of the evidence to prove the elements of an offense by asking "whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[33]

### A. Making False Statements

Madding challenges his conviction for making false statements to a public servant, contending the arresting officers did not rely on the fake name he provided.  RCW 9A.76.175 prohibits knowingly making a false or misleading statement likely to be relied upon by a public servant in the discharge of their official duties.  Officer Jones asked Madding his name, and Madding responded with his brother's name: "Joshua Hunter Madding."  Officer Jones ran that name through dispatch.  By running the name through dispatch to verify it, Officer Jones relied on Madding's false statement to carry out his duties.[34]  Because Madding

---

[32] State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).

[33] State v. Vasquez, 178 Wn.2d 1, 6, 309 P.3d 318 (2013) (internal quotation marks omitted) (quoting State v. Bencivenga, 137 Wn.2d 703, 706, 974 P.2d 832 (1999)).

[34] See State v. Godsey, 131 Wn. App. 278, 291, 127 P.3d 11 (2006) (holding sufficient evidence supported conviction for making a false statement to a

knowingly gave a false statement to Officer Jones and he relied on it to carry out his official duties, the State proved beyond a reasonable doubt that Madding violated RCW 9A.76.175.

B. Forgery

The State charged Madding with committing forgery by violating RCW 9A.60.020(1)(b).  Under that statute, "[a] person is guilty of forgery if, with intent to injure or defraud . . . [h]e or she possesses, utters, offers, disposes of, or puts off as true a written instrument which he or she knows to be forged."  Madding does not dispute he possessed fake identification cards, challenging only the evidence of his "intent to injure or defraud."  The State argues the evidence was sufficient to infer Madding's intent because Madding assaulted Norbisrath, gave a fake name to Officer Jones, and said he had the fake identification cards if he needed to book a hotel room.

Under RCW 9A.60.020(1), a person intends to "injure or defraud" if they intentionally inflict material damage or loss by deceit.[35]  Proof of intent can be inferred from the defendant's conduct and the surrounding circumstances when they "'plainly indicate such an intent as a matter of logical probability.'"[36]  Patently

---

public servant when the defendant lied to police officers about his identity but the officers knew he was lying).

[35] State v. Simmons, 113 Wn. App. 29, 32, 51 P.3d 828 (2002) (citing BLACK'S LAW DICTIONARY 434 (7th ed. 1999); WEBSTER'S THIRD NEW INT'L DICTIONARY 1164 (1986)).

[36] Vasquez, 178 Wn.2d at 8 (quoting State v. Woods, 63 Wn. App. 588, 591, 821 P.2d 1235 (1991)).

equivocal evidence does not plainly indicate intent.[37] When a defendant is charged with forgery, "[p]ossession alone is not sufficient to infer intent . . . but possession together with 'slight corroborating evidence' might be."[38]

In State v. Vasquez, the Supreme Court vacated a forgery conviction due to insufficient evidence of the defendant's intent to injure or defraud.[39] When the defendant was stopped and searched by a store security guard, the guard found a Social Security card and permanent resident card in the defendant's wallet.[40] The defendant admitted to the guard that he bought the cards from a friend.[41] The defendant told the guard he was working in the area but also indicated he was unemployed.[42] The State charged the defendant with two counts of forgery and, at trial, presented testimony from federal government witnesses that the defendant had never been issued a Social Security card, was not legally allowed to be employed in the United States without a Social Security card, and did not possess an authentic permanent resident card.[43] The security guard also testified. The jury found the defendant guilty on both counts.[44]

---

[37] Id. (citing Woods, 63 Wn. App. at 592).

[38] Id. (quoting State v. Esquivel, 71 Wn. App. 868, 870, 863 P.2d 113 (1993)).

[39] 178 Wn.2d 1, 4, 309 P.3d 318 (2013).

[40] Id.

[41] Id. at 5.

[42] Id.

[43] Id. at 5.

[44] Id. at 6.

The court vacated both convictions.[45]  First, the security guard's testimony established mere possession, and the fact of "possession alone does not support an inference of intent."[46]  Second, the evidence did not establish that the defendant attempted to pass off the forged documents as authentic.[47]  Third, the evidence about the defendant's work history was equivocal, and the State presented no evidence he even attempted to use the forged documents to defraud an employer "or had ever used the forged cards in any way."[48]

In State v. Simmons, by contrast, the court upheld a conviction for forgery when an inmate passed a counterfeit bill.[49]  The inmate gave a counterfeit $20 bill to be deposited into his account for purchases at the jail's commissary.[50]  Because the inmate did not dispute on appeal that he knew the bill was counterfeit, depositing the bill demonstrated his intent to defraud the jail.[51]

The circumstances here are similar to Vasquez.  Madding immediately admitted to Officer Jones that the identification cards were fake and that he had purchased them online.  The State argues the jury could have inferred that Madding booked his hotel room under the name on his fake identification card.  Officer Jones testified that Madding explained "he used them if he needed to, like,

---

[45] Id. at 18.

[46] Id. at 7.

[47] Id.

[48] Id.

[49] 113 Wn. App. 29, 33, 51 P.3d 828 (2002).

[50] Id. at 30-31.

[51] Id. at 33.

stay somewhere or book a room at a hotel because of his DOC warrants."[52]  But the only evidence about the name used to book the hotel room was it was "associated with Mr. Madding."[53]  None of the State's witnesses testified directly about the name used to book the room.  The State presented no evidence that Madding used or even attempted to use his fake identification cards.  Madding did not attempt to use his fake identification card to defraud the officers, identifying himself as "Joshua Hunter Madding" and not as "Nicholas Pavlik."  Thus, it is as likely Madding used the fake name he gave Officer Jones to book the room, as it is likely he used his own name, as it is likely he used the fake name on his identification card.  "'Intent may not be inferred from evidence that is patently equivocal.'"[54]

The State also argues the evidence was sufficient because "the only reason Madding would possess a forged driver's license with his real photograph and the name Nicolas Pavlik would be to falsely represent himself as Pavlik."[55]  But accepting this argument absolves the State of its burden to prove more than mere possession.  This is the same argument rejected by our Supreme Court in Vasquez.[56]

---

[52] RP (Nov. 19, 2019) at 264.

[53] Id. at 289.

[54] Vasquez, 178 Wn.2d at 8 (internal quotation marks omitted) (quoting Woods, 63 Wn. App. at 592).

[55] Resp't's Br. at 33.

[56] See Vasquez, 178 Wn.2d at 13 (holding that "mere possession of forged documents, without evidence of an intent to injure or defraud, cannot sustain a forgery conviction").

Finally, the State urges affirmance because the jury convicted Madding after being provided legally sufficient jury instructions. But the State cites no authority showing that a conviction cannot be vacated for insufficient evidence absent an erroneous jury instruction.

Unlike Simmons where the State presented evidence that the inmate actually used the counterfeit bills, the State here presented no evidence of Madding ever attempting to use his fake identification card to inflict material damage or loss by deceit. As in Vasquez, Madding's mere possession cannot be used to prove intent, and the circumstantial evidence used to prove his intent was equivocal. The evidence did not support Madding's conviction for forgery.[57]

Therefore, we affirm in part, reverse in part, and remand for the vacation of his forgery conviction.

_____

WE CONCUR:

_____    _____

---

[57] Because this is dispositive of Madding's other assigned errors for the forgery conviction, we do not address them.